## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CONGREGATION YETEV LEV D'SATMAR, INC., individually and on behalf of all others similarly situated, | ) ) ) ) | |
| | ) | Civil Action No.  1:22-cv-4844 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| ENGIE POWER & GAS, LLC f/k/a PLYMOUTH ROCK ENERGY, LLC, | ) ) | |
| | ) | |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Congregation Yetev Lev D'Satmar, Inc. ("Plaintiff"), individually and on behalf of all others similarly situated, and alleges as and for its Class Action Complaint (the "Action") against Defendant Engie Power & Gas, LLC f/k/a Plymouth Rock Energy, LLC ("Defendant" or "Plymouth"), upon personal knowledge as to itself and its own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigation made by its attorneys, as follows:

## NATURE OF THE ACTION

1.      This action seeks to redress Defendant's deceptive and improper pricing practices that have caused thousands of customers to pay considerably more for their energy services.

2.      For decades, the prices paid by customers for their electricity and natural gas services were strictly regulated. However, in recent years, state legislatures have opened energy markets to companies like Defendant (called energy service companies, or "ESCOs"), whereby customers could choose from a variety of companies selling energy services in additional to

traditional utilities.

3.    An unintended consequence of the opening of energy markets is that some ESCOs, such as Defendant, have taken advantage of deregulation to charge customers unfair energy rates. For that reason, various states, including New York, have enacted legislation to curb pricing abuses by ESCOs.  New York has adopted the Energy Services Customers Bill of Rights, N.Y. General Business Law § 349-d (the "ESCO Bill of Rights"), which mandates that ESCO contracts and marketing materials clearly and conspicuously identify all variable charges included as part of an energy plan.

4.    Defendant violates the ESCO Bill of Rights by charging customers an exorbitant variable rate initial contract term but failing to clearly and conspicuously disclose the variable charge pricing in the contract.  This practices violate New York's ESCO Bill of Rights.

5.    Further, Defendant's charging customers an exorbitant variable rate after the initial contract term constitutes a breach of contract, as Defendant's contracts expressly provide that the contract shall continue "on the same terms" after the initial contract terms, meaning on the same rate as the initial contract terms.

6.    A class action is the only way Defendant's customers can remedy Defendant's wrongdoing, as the loss suffered by each customer is small compared to the colossal task of challenging Defendant's unlawful practices, and it is thus untenable for individual customers to bring their own lawsuits.  In addition, many customers may not even realize that they are victims of Defendant's conduct.

7.    Plaintiff brings this action on behalf of itself and classes of Defendant's customers similarly harmed and described below.  Plaintiffs seek, *inter alia*, actual damages, statutory damages, treble damages, declaratory and injunctive relief, restitution, disgorgement, and

attorneys' fees and costs.

## PARTIES

8.      Plaintiff Congregation Yetev Lev D'Satmar, Inc. is a corporation organized under the laws of New York with its principal office in Brooklyn, New York.

9.      Defendant ENGIE Power & Gas, LLC f/k/a Plymouth Rock Energy, LLC is a corporation organized under the laws of New York with its principal office in Woodmere, New York.

10.     Defendant was founded in 2004 and supplies electricity and/or natural gas services to customers in Illinois, Maryland, New Jersey, New York, Ohio, and Pennsylvania.

11.     Defendant is a wholly-owned subsidiary of ENGIE North America, Inc., which is owned by French energy company ENGIE SA.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the putative plaintiff class are citizens of States different from Defendant.

13.     This Court has general personal jurisdiction over Defendant.  Defendant is a corporation organized under the laws of New York with its principal office in New York, New York.

14.     Venue is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## SUBSTANTIVE ALLEGATIONS

### The Business of ESCOs

15.　Beginning in the 1990's, many states across the United States began to deregulate their retail energy supply markets, allowing customers to purchase natural gas and electricity through an ESCO instead of through a traditional utility.

16.　Deregulation was designed to increase competition between energy suppliers in the open market by allowing customers a choice of energy suppliers, in turn lowering rates for customers.

17.　ESCOs play a middleman role, as ESCOs purchase energy from an energy company, and then sell that energy to the customer. However, ESCOs do not deliver energy to customers, as the energy is delivered by the customer's utility. ESCOs merely buy and sell gas and electricity and then sell that energy to customers with a mark-up.

18.　Thus, ESCOs are essentially brokers, as they neither produce nor deliver gas or electricity, but merely buy energy from a producer and re-sell it to customers.

19.　Because of their flexibility, ESCOs can offer alternative rates that may benefit customers from those of a traditional utility. Further, ESCOs do not have to file or seek approval from state utility regulators for the energy rates they charge customers.

20.　After a customer switches to an ESCO, the customer's energy supply charge – based either on a kilowatt-hour ("kWh") (for electricity) or therm (for gas) usage – is calculated using the supply rate charged by the ESCO.

21.　Many ESCOs, including Defendant, market to customers an attractive fixed supply charge that is comparable to, or below, the traditional local utility rate.

22.　However, the fixed supply charge is generally only for a specified term (for

4

example, 12 months), at which point the supply charge will convert to a month-to-month variable charge.

23.     The variable rates charged by ESCOs are generally always substantially higher than both the fixed rate offering and the rates charged by the traditional utility.  Further, the methodologies by which ESCO calculate the variable rates are often not disclosed to customers in the contract, or to the extent they are disclosed, the details are vague and do not parallel the actual charges on the bill.

24.     In short, during the variable month-to-month period during the initial contract term, ESCO customers are often charged outrageously high energy rates detached from market conditions that no reasonable customer would ever agree to, yet the customer is not provided any notice of the change to the variable month-to-month rate (or, often, the manner in which the variable rate is calculated by the ESCO).

25.     As a result, many state Legislatures have enacted safeguards to protect customers from the predatory practices of ESCOs.  For example, the New York Legislature has enacted the "ESCO Bill of Rights," N.Y. General Business Law § 349-d, effective January 11, 2011.

26.     In an effort to curb abuses by ESCOs in charging exorbitant variable month-to-month rates, the ESCO Bill of Rights provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be *clearly and conspicuously* identified." N.Y. Gen. Bus. Law § 349-d(7) (emphasis added).

27.     The ESCO Bill of Rights further provides that "any contract for energy services which does not comply with the applicable provisions of this section shall be void and unenforceable as contrary to public policy." N.Y. Gen. Bus. Law § 349-d(8).

**Plymouth's Contracts with Customers**

5

28.    Defendant provides form contracts to customers for the supply electricity for a fixed-term period which contain the following terms in the "Customer Disclosure Statem ent" section:

**Customer Disclosure Statement**

| Price | Fixed, Hourly LBMP or variable rate per kWh plus applicable taxes, and plus any costs and expenses resulting from a Change in Law in accordance with paragraph 18 of this Agreement. |
|---|---|
| How the price is determined | Fixed rate of $0.06970 per kWh, plus utility service and delivery charges, (GRT and sales tax where applicable) plus applicable taxes, in addition to any costs and expenses resulting from a Change in Law in accordance with paragraph 18 of this Agreement. Price does include Customer's applicable share of the Company's cost to comply with the renewable energy and zero emission credit components of the New York Clean Energy Standard. |
| Length of the agreement and end date | 24 months beginning with the first Meter Read on or after 12/1/2017 |
| Amount of Early Termination Fee and method of calculation | No early termination fee for variable service. If fixed or LBMP service Customer will be charged the projected amount of electricity to be consumed by Customer for the remainder of the current Term multiplied by the difference between the contract price in effect for the remainder of the current Term and the price at which Plymouth can sell such electricity following the termination. |
| Amount of Late Payment Fee | Customer will be charged 1.5% on overdue balances if Invoice is not paid in full within 15 days of the Invoice date. |
| Provisions for renewal of the agreement | Upon completion of the Initial Term, this Agreement will automatically renew on a month to month basis at a variable monthly rate unless Plymouth obtains customer's authorization after customer has received written notification of any proposed changes to such terms at least 45 days but no more than 90 days prior to the renewal date (the "Renewal Term"). Customer shall retain the right to renew, terminate or renegotiate this Agreement prior to the anniversary date of the renewal period. |
| Guaranteed Savings | This agreement offers no guaranteed savings. |
| Consolidated Billing | Plymouth supply charges will be presented on the utility invoice |

29.    The Customer Disclosure Statement is a part of the contract that Defendant enters into with its customers and is meant to summarize the key provisions of the contract for its customers.

30.    The Customer Disclosure Statement lists three potential price structures in the section entitled "How the price is determined": fixed, Hourly LBMP, and the "variable rate per kWh".

31.    Each contract will specific a specific length of the term (included in the section entitled "Length of the agreement and end date"); elsewhere this term is defined as the "Initial Term."

32.    In addition, each contract describes what will happen when the term ends. As set forth in the "Provisions for renewal of the agreement," Defendant's contract provides that "[u]pon completion of the Initial Term, this Agreement will automatically renew on a variable monthly

rate….". (emphasis added).

33.    A different section of the contract titled "Term" under "General Terms and Conditions," also provides that upon completion of the Initial Term, the Agreement "will automatically renew on a month-to-month basis at a variable monthly rate…":

> **2. Term.** This Agreement shall commence as of the date Customer's notice regarding the change of Customer's provider to Plymouth is deemed effective by the LDU, and shall continue for 24 months beginning with the first Meter Read on or after 12/1/2017 , (the "Initial Term"). Upon completion of the Initial Term, this Agreement will automatically renew on a month-to-month basis at a variable monthly rate, unless Plymouth sends Customer written notice of proposed changes to such terms in advance of the renewal date (the "Renewal Term"). Any such written notice will be sent at least 45 days and no more than 90 days prior to the renewal date, apprising Customer of any proposed changes in the terms and conditions of this Agreement and of the Customer's right to renew, terminate or renegotiate this Agreement. While receiving service on a month-to-month basis, either Customer or Plymouth may cancel or terminate this Agreement

34.    However, another section of the contract titled "Pricing, Billing, and Termination," under "General Terms and Conditions," states that "**all electricity sold under this Agreement** as specified above, **shall be a fixed price per kWh as agreed to above**, plus all applicable taxes" (emphasis added):

> **3. Pricing, Billing, and Termination.** Unless otherwise agreed to in writing, the price for all electricity sold under this Agreement as specified above, shall be a fixed price per kWh as agreed to above, plus all applicable taxes. Price includes line loss. (For each hour within the meter read cycle, the applicable price will be applied to the hourly consumption, for meters that do not provide hourly usage, the hourly usage will be defined by ENGIE on a best efforts basis, by distributing the read over the utility load profile.)

35.    The contract, which was drafted solely by Defendant, contradicts itself by promising on the one hand that "**all electricity** sold under this Agreement" shall be a "fixed price per kWh," while on the other hand providing that after the Initial Term, the price shall be "at a variable monthly rate." (emphasis added).

36.     The rate that a customer will be charged is a material term to the contract, likely the most material term to a customer, and yet the contract discloses contradictory rates.

37.     Defendant's contract fails to clearly and conspicuously identify the variable rate to be charged to customers upon the conclusion of the initial term, other than to state that there is a "variable rate."

38.     The variable rates charged by Defendant to customers upon the conclusion of the initial term are significantly higher than both the fixed-price rate and the rate charged by the traditional utility.

39.     Defendant provides no transparency on its billing statements to customers as to how the rate charged following the initial term is calculated.  The variable rate is not defined by the contract, and there is no indication, or detail of how, if at all, that this differs in any material manner from the fixed rate pricing.

40.     The actions of Defendant as described herein violate the spirit and letter of Section 349-d, as the law is explicitly designed to protect energy customers and allow them to make informed decisions when deciding whether to switch to an ESCO.  Defendant's actions do the exact opposite.  While the language of the contract presents an overall impression to the customer that there will be a fixed price for the duration of the relationship, not just the contract term, in practice the billing reflects a variable form of billing that is not supported by the contract, and clearly violates Section 349-d (7):

> "In every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified".

**Facts Regarding Plaintiff**

41.     Plaintiff is a synagogue located in Brooklyn, New York.

42.     On or about November 9, 2017, Plaintiff contracted with Defendant for Defendant to supply electric service for a variety of residential and religious units in Brooklyn, New York for a 24 month term.  The service start date was December 1, 2017.

43.     Plaintiff satisfies the definition of a "customer" under N.Y. General Business Law § 349(d), as it is a person who is sold or offered an energy services contract by Defendant, who is an ESCO, for residential utility service.

44.     A copy of the contract between Plaintiff and Defendant is attached hereto as "Exhibit A" and incorporated by reference herein.  Upon information and belief, the contract is a uniform contract that Defendant has drafted and used for all customers with materially the same terms.

45.     Pursuant to the contract, Defendant agreed to provide Plaintiff electricity service at a fixed-price rate of $0.06970 per kWh.

46.     The contract provides that "all electricity sold under this Agreement as specified above, shall be a fixed price per kWh as agreed to above, plus all applicable taxes."  The "fixed price per kWh as agreed to above" is the rate of $0.06970 per kWh.

47.     The contract fails to clearly and conspicuously disclose that Plaintiff would be charged a variable rate upon the conclusion of the 24 month term.

48.     Upon conclusion of the 24 month term, without prior notice to Plaintiff, Defendant began charging Plaintiff a variable month-to-month rate.

49.     The variable month-to-month rate charged by Defendant upon the conclusion of the 24 month term is significantly higher than the original fixed-price rate.  In fact, the variable rates

9

charged by Defendant each month were approximately double the original fixed-price rates, as well as double the rates charged by Consolidated Edison, Plaintiff's regular utility provider.

50.     Defendant has not disclosed to Plaintiff how its month-to-month variable rates are calculated.

## CLASS ALLEGATIONS

51.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiff brings this action on its own behalf and on behalf of the proposed Classes[1]: Plaintiff bring this action on behalf of itself and the proposed Nationwide Class:

> All persons in the United States who were charged a variable rate by Defendant on an electric contract after the Initial Term of the contract expired during the applicable statute of limitations period up to and including the date of judgment.

52.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiff brings this action on behalf of itself and the proposed New York Subclass:

> All persons in the State of New York who were charged a variable rate by Defendant on an electric contract after the Initial Term of the contract expired during the applicable statute of limitations period up to and including the date of judgment.

53.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed.

54.     Excluded from the Classes are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of Defendant.

55.     This action is properly maintainable as a class action.  The proposed Classes are so

---

[1] Unless otherwise specified, all references in this Complaint to "Classes" or the "Class" refer collectively to the Nationwide Class and the New York Class.

numerous that joinder of all members, whether otherwise required or permitted, is impracticable. There are questions of law or fact common to all Class Members that predominate over any questions affecting only individual members.  Specifically, the common questions of fact and law include:

      a.   Whether Defendant breached its contracts with Plaintiff and the Class;

      b.   Whether Defendant violated New York General Business Law § 349 and § 349-d;

      c.   Whether Defendant was unjustly enriched as a result of its conduct;

      d.   Whether Plaintiff and the Class have sustained damages and, if so, the proper measure thereof;

      e.   Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

      f.   The extent of class-wide injury and the measure of damages for those injuries.

56.     The proposed lead Plaintiff's claims are typical of those of the proposed Class because the proposed lead Plaintiff's claims are based upon the same facts and circumstances that give rise to the claims of the other Class Members and are based upon the same predominate legal theories.

57.     The representative Plaintiff can adequately and fairly represent the Class.  No conflict of interest exists between the representative Plaintiff and the Class Members because Defendant's alleged conduct affected them similarly.

58.     The Plaintiff and its chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be able to assist in its prosecution.  In addition, the Plaintiff's attorneys are competent in the areas of law

relevant to the Complaint and have sufficient experience and resources to vigorously represent the Class members and prosecute this action.

59.    A class action is superior to any other available method for adjudicating this controversy.  The proposed class is (i) the surest way to fairly and expeditiously compensate so large a number of injured persons that constitute the Class, (ii) to keep the courts from being inundated by hundreds or thousands of repetitive cases, and (iii) to reduce transactions costs so that the injured Class Members can obtain the most compensation possible.  Accordingly, class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious wasteful litigation relevant to this action.

## CLAIMS FOR RELIEF

## COUNT I

## BREACH OF CONTRACT

## (ON BEHALF OF THE NATIONWIDE CLASS, OR ALTERNATIVELY, ON BEHALF OF THE NEW YORK SUBCLASS)

60.    Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

61.    Plaintiff and the Class were bound by valid contracts with Defendant for the provision of energy services.

62.    Each of those contracts provide that "all electricity sold under this Agreement as specified above, shall be a fixed price per kWh as agreed to above."

63.    Pursuant to those contracts, Plaintiff and the Class agreed to pay Defendant's fixed price rate, and did so.

64.    However, Defendant breached its obligations under the contract, as Defendant failed upon the conclusion of the initial term to charge a fixed price rate.  Instead, Defendant

charged Plaintiff and the Class a variable rate that was much higher than the rate charged during the initial term.

65.     Plaintiff and the Class have been damaged as a result because upon the conclusion of the initial term, they paid energy charges that were higher than Defendant was authorized to charge pursuant to the contract.

66.     As a result of Defendant's breaches, Defendant is liable to Plaintiff and the Class for damages and attorneys' fees and expenses.

## COUNT II

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

## (ON BEHALF OF THE NATIONWIDE CLASS, OR ALTERNATIVELY, ON BEHALF OF THE NEW YORK CLASS)

67.     Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

68.     Plaintiff and Class were bound by valid contracts with Defendant for the provision of energy supply.

69.     Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract. The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

70.     Under the contract, to the extent Defendant had discretion to set the variable rate for energy based on energy market pricing, it was obligated to exercise its discretion in good faith.

71.     Plaintiff reasonably expected that the energy rates would, notwithstanding Defendant's profit goals, reflect the wholesale and retail market prices for energy and that Defendant would refrain from price gouging. Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy energy from Defendant.

13

72.     Defendant breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiff's and other Class Members' reasonable expectations that Defendant's variable energy rate would be commensurate with market conditions.

73.     As a result of Defendant's breaches, Defendant is liable to Plaintiff and members of the Class for damages and attorney's fees and expenses.

## COUNT III

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349

### (ON BEHALF OF THE NATIONWIDE CLASS OR IN THE ALTERNATIVE THE NEW YORK SUBCLASS)

74.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

75.     Defendant's contracts with Plaintiff and the Class provide that the contracts are governed by New York law.

76.     Plaintiff brings this claim under N.Y. General Business Law § 349 on their own behalf and on behalf of each member of the Nationwide Class or, in the alternative, the New York Subclass.

77.     New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349.

78.     Defendant's marketing and billing practices are consumer-oriented in that they are directed at members of the consuming public.

79.     Defendant has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349, including:

a) Failing to adequately disclose that despite the language of its contracts, Defendant's energy rates will not renew at the same rates upon the conclusion of the initial term, and instead will be at a variable rate;

b) Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates a customer's existing utility charges;

c) Failing to adequately disclose that customers paying Defendant's variable energy rates receive no material added benefit at a dramatically higher price than if the customer were to stay with the local utility;

d) Failing to provide customers adequate advance notice of the variable rates it would charge;

e) Failing to adequately disclose the variable rate methodology Defendant used to calculate its variable rates to enable customer to potentially compare prices;

f) Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the customer's local utility would have charged; and

g) Failing to adequately disclose that it makes substantially higher profits on its variable rate customers than its fixed rate customers even though there is no material difference between the costs Defendant incurs for its fixed rate customers and those its incurs for its variable rate customers.

80.    The aforementioned acts are unfair, unconscionable and deceptive and are contrary to the public policy of New York, which aims to protect customers.

81.    As a direct and proximate result of Defendant's unlawful and deceptive marketing

and billing practices, the Class has suffered injury and monetary damages in an amount to be determined at the trial of this action.

82.     Plaintiff and the members of the Class further seek equitable relief against Defendant.  Pursuant to N.Y. Gen. Bus. Law § 349, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiff and the Class all amounts wrongfully assessed and/or collected.

83.     As a result of Defendant's unfair and deceptive practices, Plaintiff and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs and reasonable attorneys' fees and all other relief available under N.Y. Gen. Bus. Law § 349.

## COUNT IV

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349-D

### (ON BEHALF THE NATIONWIDE CLASS OR IN THE ALTERNATIVE THE NEW YORK SUBCLASS)

84.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

85.     Plaintiff brings this claim under N.Y. Gen. Bus. Law § 349-d on their own behalf and on behalf of each member of the Class.

86.     N.Y. Gen. Bus. Law § 349-d(7) provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be *clearly and conspicuously* identified." N.Y. Gen. Bus. Law § 349-d(7) (emphasis added).

87.     The terms that Defendant provides to its customers fail to clearly and conspicuously

inform customers of Defendant's variable energy rates or other factors affecting Defendant's variable rates.

88.     Defendant has violated Section 349-d(7) and caused financial injury to Plaintiff and the Class by causing Plaintiff and the Class to pay more for energy than they would have had they stayed with their previous supplier or chosen a different supplier.

89.     As shown above, Defendant has willfully or knowingly violated Section 349-d.

90.     As a direct and proximate result of Defendant's violation of Section 349-d, the Class has suffered injury and monetary damages in an amount to be determined at the trial of this action.

91.     Plaintiff and the members of the Class further seek equitable relief against Defendant.  Pursuant to N.Y. Gen. Bus. Law § 349-d, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiff and the Class all amounts wrongfully assessed and/or collected.

92.     As a result of Defendant's unfair and deceptive practices, Plaintiff and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs and reasonable attorneys' fees and all other relief available under N.Y. Gen. Bus. Law § 349-d.

## COUNT V

### UNJUST ENRICHMENT

### (ON BEHALF OF THE NATIONWIDE CLASS OR IN THE ALTERNATIVE THE NEW YORK SUBCLASS)

93.     Plaintiff re-alleges and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

94.     Plaintiff and the Class Members would not have contracted with Defendant for energy had they known the truth about Defendant's variable energy rates.

95.     By engaging in the conduct described above, Defendant has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiff and Class Members.

96.     It would be unjust and inequitable for Defendant to retain the payments Plaintiff and Class Members made for excessive energy charges.

97.     Therefore, Defendant is liable to Plaintiff and Class Members for the damages that they have suffered as a result of Defendant's actions.

**WHEREFORE**, Plaintiff respectfully requests that the Court:

(a) Issue an order certifying the Class defined above, appointing Plaintiff as Class representative, and designating its Attorneys as Class Counsel;

(b) Find that Defendant has committed violations of the law alleged herein;

(c) Enter an order granting monetary relief and damages on behalf of the Class;

(d) Enter an order granting all appropriate relief on behalf of the Class;

(e) Render an award of compensatory damages, the amount of which is to be determined at summary judgment or trial;

(f) Render an award of treble damages and/or punitive damages;

(g) Enter judgment including interest, costs, reasonable attorneys' fees, and expenses; and

(h) Grant all such other relief as the Court deems appropriate.

## **JURY TRIAL DEMAND**

Plaintiff hereby demand a jury trial on all issues so triable.

Respectfully submitted, this the 17ᵗʰ day of August, 2022.

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**

*/s/ Victoria J. Maniatis*
Victoria J. Maniatis (NY Bar No.: 2578896)
James R. DeMay *(pro hac vice pending)*
Blake Yagman (NY Bar No. 5644166)
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
100 Garden City Plaza
Garden City, NY 11530
Telephone: (800) 530-9800
Email: vmaniatis@milberg.com
Email: jdemay@milberg.com
Email: pwallace@milberg.com
Email: byagman@milberg.com

**STEIFMAN LLP**

*/s/ Michael Steifman*
Michael Steifman, Esq. (MS-8216)
(*admission pending*)
Steven P. Knowlton, Esq. (SK-2429)
STEIFMAN LLP
292 Montauk Highway
South Hampton, New York 11968
Telephone: 718-645-4100
Email: ms@steifmanlaw.com
Email: sknowlton@steifmanlaw.com