UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**Congregation Yetev Lev D'Satmar, Inc.,** individually and behalf of all others similarly situated,

Plaintiff,

v.

**Engie Power & Gas, LLC f/k/a Plymouth Rock Energy, LLC,**

Defendant.

No. 1:22-cv-04844-NRM-RER

**Opinion and Order**

**NINA R. MORRISON**, United States District Judge:

A Netflix subscription, a gym membership, and a home energy bill: what do each of these have in common?  Each is a form of a recurring monthly charge in which rate increases can go unnoticed by consumers after the initial sign-up period.  It is the last that is the subject of this case—one of the latest in a recent string of legal challenges to the variable-rate billing practices of energy services companies ("ESCOs").

Plaintiff Congregation Yetev Lev D'Satmar, Inc. ("Plaintiff") signed a contract in 2017 with Defendant Engie Power & Gas, LLC, formerly known as Plymouth Rock Energy, LLC ("Plymouth Rock" or "Defendant"),[1] an ESCO.  After twenty-four months of Plymouth Rock charging a Plaintiff a low, fixed, monthly "teaser" rate under the contract, Plaintiff alleges, Plymouth Rock began unlawfully charging a higher, variable rate.  Plaintiff

---

[1] In 2019, after the parties entered into the contract at issue in this case, Plymouth Rock was acquired and its name was changed to Engie Power & Gas, LLC.  Def.'s Mot. 5 n.1, ECF No. 17.  Defendant referred to itself as Plymouth Rock throughout its briefing, and the Court does so here.  *See id.*

- 1 -

brought this putative class action and Plymouth Rock filed a motion to dismiss.

For the reasons below, the Court grants dismissal of Plaintiff's breach of contract claim; denies dismissal of Plaintiff's implied covenant of good faith and fair dealing claim; grants in part and denies in part dismissal of Plaintiff's claims under sections 349 and 349-d(7) of the New York General Business Law, and grants dismissal (on consent) of Plaintiff's unjust enrichment claim.

## I.   BACKGROUND

Unless otherwise indicated, the following facts are taken from **the** Complaint.  *See* Compl., ECF No. 1 (Aug. 17, 2022).

### A.   ESCOs

For decades, customers have purchased electricity and natural gas through a public utility, whose prices states have strictly regulated.  *See* Compl. ¶ 2.  In the 1990s, states began deregulating their energy markets, which allowed customers to purchase electricity and natural gas through an ESCO instead of a public utility.  *See* Compl. ¶ 15.  An ESCO acts as a broker, purchasing energy from an energy company and then selling energy to customers.  The ESCO can charge for energy, measured in kilowatt hours (kWh) for electricity, at different rates than a utility and change rates without approval from state regulators.  Compl. ¶¶ 17–19.  In practice, ESCOs often charge a fixed rate for a term—say, 12 months—and then switch the customer to a month-to-month variable rate.  Compl. ¶¶ 21–22.

ESCOs have tended to charge variable rates "substantially higher" than the fixed rates or traditional public utility rates, and to not accompany their rates with clear explanations.  Compl. ¶¶ 23–24.  Such practices have drawn scrutiny in states including New York,[2] leading the state legislature to

---

[2] As alleged by energy customers in similar litigation, concerns about ESCO's marketing practices reached such a tipping point that, "in December

pass the ESCO Bill of Rights in 2011.  Compl. ¶¶ 25–28.  Among other safeguards, the ESCO Bill of Rights requires that "all variable charges shall be clearly and conspicuously identified."  N.Y. Gen. Bus. Law § 349-d(7).

### B.   Plymouth Rock's form contract

Plymouth Rock gave customers a form contract, the New York Electricity Commercial Service Agreement, which Plaintiff later signed.  *See* Compl. ¶ 28.  In a box on the first page entitled "Customer Disclosure Statement," the contract described:

- the price as "Fixed, Hourly LBMP or variable rate per kWh plus applicable taxes";

- "[h]ow the price is determined" as "Fixed rate of $0.06970 per kWh, plus utility service and delivery charges;"

- the length of the agreement and end date as "24 months beginning with the first Meter Read on or after 12/1/2017;" and

- the "[p]rovisions for renewal of the agreement" as "[u]pon completion of the Initial Term, this Agreement will automatically renew on a month to month basis at a variable monthly rate . . . "

Compl. Ex. A at 2, ECF No. 1-1 ("Agreement"); *see also* Figure 1, *infra* (picture of page 1 of Agreement).[3]  The Agreement then listed "General Terms and Conditions."  Under "2. Term," the Agreement provided that:

**2. Term.**   […]   Upon completion of the Initial Term, this Agreement will automatically renew on a month-to-month basis

---

2016, following a flood of consumer complaints and negative media reports, the New York State Public Service Commission ("PSC") permanently prohibited ESCOs from serving low-income customers."  *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 175 (2d Cir. 2019).

[3] All page numbers refer to Electronic Case Filing ("ECF") page numbers.

at a variable monthly rate […].

Agreement at 3.  Then, under "3. Pricing, Billing, and Termination," the Agreement provided that:

> **3. Pricing, Billing, and Termination.** Unless otherwise agreed to in writing, the price for all electricity sold under this Agreement as specified above, shall be a fixed price per kWh as agreed to above, plus all applicable taxes. . . .

*Id.* at 3.

### C.    Plaintiff contracts with Plymouth Rock

On November 9, 2017, Plaintiff signed a two-page form contract with Plymouth Rock for energy services to be provided to its residential and religious units, with service to start on December 1, 2017.  See Compl. ¶ 28, 42; Agreement at 2.  Twenty-four months later, on or about December 1, 2019, the Initial Term of service ended.  Without "prior notice," Plymouth Rock began charging Plaintiff an electric rate "approximately double the original fixed-price rates, as well as double the rates charged by Consolidated Edison, Plaintiff's regular utility provider."  Compl. ¶¶ 48–49.  These charges lasted for approximately one year before Plaintiff noticed.  Oral Argument Tr. ("Tr.") 3:21–23.  Plymouth Rock did not disclose to Plaintiff how these variable rates were calculated.  Compl. ¶ 50.

### D.    Procedural history

Plaintiff filed this putative class action against Plymouth Rock on August 17, 2022.  Plymouth Rock filed a request on November 1, 2022, for a pre-motion conference for a proposed motion to dismiss all claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  On November 8, 2022, Plaintiff filed a response.  The Court denied the PMC request as moot on February 22, 2023.  Plymouth Rock's motion was fully submitted on April 21, 2023, and the Court held oral argument on June 27, 2023.

## II.    LEGAL STANDARD

Under Rule 12(b)(6), a complaint must plead "enough facts to state a

claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Green v. Dep't of Educ. of City of N.Y.*, 16 F.4th 1070, 1076 (2d Cir. 2021) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). A court should construe a complaint "liberally," accept "all factual allegations . . . as true," and draw "all reasonable inferences in the plaintiff's favor." *Id.*

## III. DISCUSSION

### A. Breach of Contract

A "complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). "At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016). Whether a contract is ambiguous is a question of law for a court to decide. *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465–66 (2d Cir. 2010) (citations omitted).

Under New York law, a contract is ambiguous "if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Orchard Hill Master Fund Ltd.*, 830 F.3d at 156–57 (citation omitted); *see also Orlander v. Staples, Inc.*, 802 F.3d 289, 295 (2d Cir. 2015) ("[T]he ambiguity analysis should be constrained by normal rules of contract interpretation: words and phrases should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions.") (citation and alterations omitted). But if the contract language "has a definite and precise meaning" that leaves "no reasonable basis for a difference of opinion," a contract is unambiguous. *Orchard Hill Master Fund*

*Ltd.*, 830 F.3d at 157.

In recent years, the Second Circuit has twice considered breach of contract claims arising from variable-rate pricing terms in ESCO contracts. In *Richards v. Direct Energy Services, LLC,* the Second Circuit affirmed a grant of summary judgment on a breach of contract claim where a Connecticut ESCO's contract stated: "After the Initial Term and during the Renewal Period, the rate for electricity will be variable each month at Direct Energy's discretion.  The rate may be higher or lower each month based upon business and market conditions."  *See* 915 F.3d 88, 97 (2d Cir. 2019). Because the contract gave the ESCO "discretion" to set the rate based on "business and market conditions," the court held that a reasonable consumer could not believe that the rate would directly map onto procurement costs. *Id.* at 98.

Just a few months later, however, the Second Circuit reversed dismissal of a breach of contract claim in *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173 (2d Cir. 2019).  There, the ESCO's customer agreement stated that the plaintiffs would pay a "monthly variable rate" that would be "based on [the ESCO's] actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs."  *Id.* at 175.  The court found that the plaintiffs had plausibly alleged a breach of contract after alleging (with expert data in their complaint) that the ESCO began charging rates that "showed significant upward deviations from the Market Supply Cost and continued to rise even when that cost fell" despite the ESCO's "promis[e] to base its rates on supply costs[.]"  *Id.* at 177; *see also Melville v. HOP Energy, LLC*, No. 21-CV-10406 (KMK), 2023 WL 2648775, at *3 (S.D.N.Y. Mar. 27, 2023) (describing *Mirkin*).

Subsequent cases in this Circuit with alleged breaches of ESCO contracts have turned on how—if at all—a contract describes how an ESCO will determine its variable rate once the fixed-rate term ends.  *Compare Nieves v. Just Energy N.Y. Corp.*, No. 17-CV-561S, 2020 WL 6803056, at *4 (W.D.N.Y. Nov. 19, 2020) (dismissing breach of contract claim where ESCO's contract stated variable rate changes would be determined "according to business and market conditions" without further definition) *with Melville v. HOP Energy, LLC*, No. 21-CV-10406 (KMK), 2023 WL 2648775, at *7

(S.D.N.Y. Mar. 27, 2023) (denying dismissal of breach of contract claim where a reasonably intelligent person could construe ESCO's promise to charge variable rate at "our Promotional Prevailing Retail Price" as promise to charge a price not markedly higher than the prevailing retail price in a region). In *Stanley v. Direct Energy Services, LLC*, for example, a breach of contract claim survived a defendant ESCO's motion to dismiss where a plaintiff alleged that the ESCO promised in its renewal notification that it would offer "the most competitive pricing," that the "Pricing Type" would be "Market," that the "Renewal Price" would be "Variable," and that it would use an unspecified "monthly variable rate methodology" to set its monthly variable rate." 466 F. Supp. 3d 415, 424–25 (S.D.N.Y. 2020). The plaintiff could not proceed with a breach of contract claim based on the fact that the ESCO charged variable rates at the end of the initial term, since the plaintiff had agreed to a fixed rate term of six months that would "automatically convert to a monthly variable price agreement with no end date." *Id.* at 426–27. But the breach of contract claim survived since its "crux" was the allegation that the variable rate was untethered to "Market Supply Costs": the rate was allegedly higher than either wholesale market supply costs or comparable variable rates from ESCOs and the plaintiff had plausibly alleged the rate conflicted with the contract's terms. *Id.* at 427.

The crux of Plaintiff's breach of contract claim here, however, consists of the *fact* of a rollover into a variable rate. Plaintiff alleges that Plymouth Rock breached its contract because it "failed upon the conclusion of the initial term to charge a fixed price rate . . . " Compl. ¶ 64. Yet, like the clear rollover term in *Stanley*, the Customer Disclosure Statement and Term 2 both said that, after the Initial Term, the Agreement will "automatically renew" at a variable rate. *See* 466 F. Supp. 3d at 426–27; Agreement at 2. Indeed, four separate references to a variable rate appear in the two-page agreement:

- Customer Disclosure Statement, under "Provisions for renewal of the agreement": "Upon completion of the Initial Term, this Agreement will automatically renew on a month to month basis at a variable monthly rate . . . ";

- Customer Disclosure Statement, under "Price": "Fixed, Hourly

> LBMP **or** variable rate per kWh";
>
> - Customer Disclosure Statement, under "Amount of Early Termination Fee and method of calculation": "No early termination fee for variable service"; and
>
> - General Terms and Conditions, under "2. Term": "Upon completion of the Initial Term, this Agreement will automatically renew on a month-to-month basis at a variable monthly rate . . . "

Agreement at 2.

Still, Plaintiff contends, Term 3's language stands "in direct conflict" with Term 2. Pl.'s Opp'n 20, ECF No. 18. To Plaintiff, Term 3 creates ambiguity when it states that, "Unless otherwise agreed to in writing, the price for *all electricity* sold under this Agreement as specified above, *shall be a fixed price per kWh* as agreed to above, plus applicable taxes." Agreement at 3; Pl.'s Opp'n 20 (emphasis added). But Plaintiff's contention fails when viewed in the "context of the entire integrated agreement." *See Orchard Hill Master Fund Ltd.*, 830 F.3d at 157. Going back to Term 3, "all electricity" did not actually mean all: "as specified above" and "as agreed to above" limited the meaning of "all." This is because what was "above"—*i.e.*, what preceded the phrase "all electricity"—were the disclosures of the existence of a variable rate in the Customer Disclosure Statement and Term 2. *See* Agreement at 2. When looking at the Agreement to give "full meaning and effect" to all its provisions, including the Customer Disclosure Statement, Term 2, and Term 3 together, there is "no reasonable basis for a difference of opinion" as to whether the Agreement discloses the existence of a variable rate. *See Orchard Hill Master Fund Ltd.*, 830 F.3d at 157.

Plaintiff's breach of contract claim might survive if the terms of the Agreement could lead to a plausible allegation that Plymouth Rock charged a variable rate in a manner inconsistent with the Agreement's references to that variable rate. Unlike the contracts at issue in *Mirkin*, *Stanley,* and *Melville,* however, the Agreement does not contain terms that create any expectations as to how Plymouth Rock might calculate a variable rate: noticeably absent are terms that describe a variable rate as a function of

supply costs, a rate dependent on a promotional price, or a market rate, respectively. *Compare Mirkin*, 931 F.3d at 175, *Melville*, 2023 WL 2648775, at \*7, *and Stanley*, 466 F. Supp. 3d at 426–27 *with* Agreement at 2 ("this Agreement will automatically renew on a month-to-month basis at a variable monthly rate"). And there is no requirement in this Circuit or under New York law that such contracts must affirmatively disclose how the ESCO intends to set its variable rate, provided that the ESCO's option to switch to a variable rate at the conclusion of a fixed term is (as here) clearly and unambiguously disclosed.

Put another way, the terms of the Agreement are not ambiguous about Plymouth Rock's intent to switch to a variable rate at the end of the twenty-four-month Initial Term. Nor can it plausibly be read to suggest that Plymouth Rock breached its contract with Plaintiff when it exercised its right to charge a variable rate at that time, even though the contract was silent as to how the variable rate might be calculated.

Plymouth Rock's motion to dismiss Plaintiff's breach of contract claim is granted.

## B. Implied Covenant of Good Faith and Fair Dealing

Plaintiff alleged in the Complaint that Plymouth Rock breached the implied covenant of good faith and fair dealing by "unreasonably exercising its rate-setting discretion" to "price gouge and frustrate . . . reasonable expectations" that the variable rate would be "commensurate with market conditions." Compl. ¶ 72. In its Motion to Dismiss, Plymouth Rock argues that the implied covenant does not "allow Plaintiff to rewrite the Agreement to include a 'commensurate with market conditions' requirement not found in the text," and that Plaintiff has failed to establish that Plymouth Rock set rates "arbitrarily or irrationally." *See* Def.'s Mot. 13–14; Def.'s Reply 6–7.

"[I]mplicit in every contract" under New York law is a covenant of good faith and fair dealing that encompasses "any promises that a reasonable promisee would understand to be included." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (citation omitted). While a party's action must "directly violate an obligation that may be presumed to have been intended by the parties," the implied covenant "embraces a pledge" that

neither party will act in a way that "ha[s] the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *See Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (citation omitted); *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 (2002)). Even when a contract gives a party discretion, that contract still "include[s] an implied promise that neither party will act arbitrarily or irrationally in exercising that discretion." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 810 (2d Cir. 2014) (citation omitted).

At the motion to dismiss stage, courts have declined to dismiss implied covenant claims where plaintiffs have plausibly alleged that defendant ESCOs violated such covenants by exercising their discretion in a manner that resulted in "unreasonable" rates. In *Claridge v. North American Power and Gas, LLC*, for example, a court denied a motion to dismiss an implied covenant claim where defendant allegedly "violated the covenant by exercising [any price-setting] discretion [it may have had] in bad faith and in a manner inconsistent with [Plaintiff's] reasonable expectations." No. 15-CV-1261 PKC, 2015 WL 5155934, at *6 (S.D.N.Y. Sept. 2, 2015). The court in *Hamlen v. Gateway Energy Services Corporation* did the same where a plaintiff alleged a defendant "acted in bad faith by exercising its discretion to charge unreasonable rates to profiteer off its customers, who reasonably expected to pay [the] defendant competitive prices for natural gas" and that "the implied covenant of good faith and fair dealing requires [the] defendant to seek a profit that is commercially reasonable"). No. 16-CV-3526, 2017 WL 892399, at *5 (S.D.N.Y. Mar. 6, 2017). So did the *Stanley* court when a plaintiff "expressly allege[d]" that, even if the ESCO "contractually . . . had unilateral discretion to set the variable rate for electricity," plaintiff "reasonably expected that the variable rates for electricity would, notwithstanding Defendant's profit goals, reflect the wholesale and retail market prices for electricity and that Defendant would refrain from price gouging" and that "[w]ithout these reasonable expectations, Plaintiff and other Class members would not have agreed to buy electricity from Defendant." 466 F. Supp. 3d at 429.

Like the implied covenant claims in the cases above—but unlike

Plaintiff's breach of contract claim that concerned only the *existence* of a variable rate—Plaintiff's good faith and fair dealing claim here concerns the *rate-setting*.  Plaintiff challenges what it contends was an excessive and unreasonable rate increase, arguing that Defendant breached the parties' implied covenant by charging variable rates that were (1) "approximately double" the twenty-four-month term fixed-price rate of $0.06970 per kWh, and (2) "double" the rate charged by Plaintiff's "regular utility provider," Consolidated Edison.  *See* Compl. ¶¶ 46–49. The Complaint alleges that Plymouth Rock, to the extent it had discretion to set a variable rate, had an obligation to exercise any discretion in good faith; that Plaintiff "reasonably expected"[4] such rates would "reflect the wholesale and retail market prices for energy" and that Plymouth Rock would "refrain from price gouging;" and that, "[w]ithout these reasonable expectations, Plaintiff and other [putative] Class Members would not have agreed to buy energy" from Plymouth Rock. *Id.* at ¶¶ 70–71.

Plymouth Rock argues that Plaintiff has not plausibly alleged that it "unreasonably exercised its rate-setting discretion." *Id.* at ¶ 72.  But Plaintiff's allegations are sufficient to defeat a motion to dismiss. Specifically, Plaintiff has alleged that the variable rates Plymouth Rock charged are higher than the fixed-price rate and traditional utility rates, and that (more generally) "ESCO customers are often charged outrageously high energy rates detached from market conditions."  *Id.* at ¶¶ 24, 38, 39.

Implied covenant claims that have survived at the motion to dismiss stage, Plymouth Rock contends, differ from Plaintiff's claim because those

---

[4] In explaining why the facts in *Richards* could have allowed a jury to conclude that a defendant ESCO's pricing practices undermined "legitimate expectations set by the contract," Judge Pooler observed that consumers' expectations are "nearly always legal fictions, but the law is clear that they are fictions on which we are to rely."  915 F.3d at 112, 112 n.5 (Pooler, J., concurring in part and dissenting in part).  Still, a "recent suggestion to tether these fictions to reality is the admission of survey evidence on what particular passages mean."  *Id.* (citing Omri Ben-Shahar & Lior Jacob Strahilevitz, *Interpreting Contracts via Surveys and Experiments*, 92 N.Y.U. L. Rev. 1753 (2017)).

claims have arisen from "express representations by the ESCO" to tie a variable rate to "market conditions or some other criteria not present here." *See* Def.'s Reply 7 (citing *Stanley*, 466 F. Supp. 3d at 421; *Claridge*, 2015 WL 5155934, at *4-6; *Hamlen*, 2017 WL 892399, at *1, *3, *5; *Melville*, 2023 WL 2649775, at *9; *Richards*; 120 F. Supp. 3d at 152). But such a requirement is not found in Second Circuit case law at the motion to dismiss stage. It is true that in *Richards*, the Second Circuit granted summary judgment against a plaintiff on a Connecticut good faith and fair dealing claim since the defendant had "discretion in setting the variable rate." 915 F.3d at 99. But there, even with the full benefit of discovery, the plaintiff had no evidence to suggest that the defendant's rate was "any higher than its competitors' rates" or to explain why—when other Connecticut private energy providers engaged in similar pricing behavior—defendant's pricing was "improper." *Id.*

At the motion to dismiss stage, Plaintiff need only plausibly allege that Plymouth Rock charged a variable rate in bad faith by asserting specific facts that a jury could rely upon to conclude that this rate was unreasonable. Like the plaintiffs in *Claridge*, *Hamlen*, and *Stanley*, Plaintiff does so here, by asserting that Plymouth Rock charged a variable rate that was (among other things) nearly twice as high as its competitors.

Plymouth Rock takes issue with the plausibility of these allegations. In its motion, Plymouth Rock cited a New York trial court that dismissed a good faith and fair dealing claim where a plaintiff would have had to "plead some additional facts, other than price alone" to suggest a defendant's practices were "arbitrary or irrational." Def.'s Reply 7–8 (citing *Bell v. Gateway Energy Services Corp.*, No. 031168/2018, 2018 WL 4682424, at *5 (N.Y. Sup. Ct. Sep. 13, 2018)). The plaintiff in that case plead facts about the defendant's kWh price as compared to wholesale prices but plead no facts specific to rate-setting, *see Bell*, 2018 WL 4682424, at *4, 12, whereas here, Plaintiff related the price to the Agreement's fixed price, a public utility price, and similar practices by other ESCOs. *See* Compl. ¶¶ 23, 38, 39, 70–72.

Finally, the dismissal of the breach of contract claim above moots the issue of whether these claims are duplicative. *See* Def.'s Reply 8 (arguing that both Plaintiff's implied covenant and breach of contract claims "seek to recover damages based on the core allegation that the monthly variable rate

was too high in comparison to Plaintiff's expectations" and are "premised on the conversion of Plaintiff's rates from fixed to variable after the initial contract term"). Whether a plaintiff can recover on both breach of contract and implied covenant claims (assuming the plaintiff plausibly plead both) is generally "not eligible for resolution as a matter of law" at this stage. *Stanley*, 466 F. Supp. 3d at 430 (discussing cases). To the extent the Court does not dismiss one claim on other grounds, that determination is properly reserved for summary judgment.

For the reasons stated above, Plymouth Rock's motion to dismiss Plaintiff's implied covenant claim is therefore denied.

### C.    N.Y. Gen. Bus. Law § 349

Plymouth Rock seeks to dismiss Plaintiff's claim under section 349 of the New York General Business Law, a statute enacted in 1970 that prohibits "[d]eceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." *See Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 24, 647 N.E.2d 741, 744 (1995) (quoting statute and describing legislative history). To state a claim under § 349, a plaintiff must "allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander*, 802 F.3d at 300 (quoting *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 944 N.Y.S.2d 452, 967 N.E.2d 675 (2012)).[5] "[A]n action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b), Fed.R.Civ.P., but need only meet the bare-bones notice-pleading requirements of Rule 8(a)." *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005). Plymouth Rock contests (2) and (3). *See* Def.'s Mot. 15.

Under (2), a court "may determine as a matter of law" whether an

---

[5] The Complaint here only alleges deceptive practices under § 349, but courts in ESCO cases consider § 349 and § 349-d(3), an ESCO Bill of Rights provision that prohibits deceptive practices in the marketing of energy services, to have the "same elements." *Claridge*, 2015 WL 5155934, at *4.

allegedly deceptive practice would have "misled a reasonable consumer." *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013); *see also Orlander*, 802 F.3d at 300 (applying, to § 349 claims, an "objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'") (citations omitted).

For (3), a plaintiff sufficiently pleads causation when a complaint alleges that the plaintiff has "suffered injury" "because of a defendant's deceptive act." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29-30, 709 N.Y.S.2d 892, 896, 731 N.E.2d 608, 611–12 (2000); *see also Stanley*, 466 F. Supp. 3d at 435 (applying *Stutman*). And it is enough for a "plaintiff to plead the disclosures he or she received were inadequate, misleading, or false, and that she was injured as a result of the insufficient or false disclosures." *Belfiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440, 446 (E.D.N.Y. 2015). "Although a monetary loss is a sufficient injury to satisfy the requirement under § 349, that loss must be independent of the loss caused by the alleged breach of contract." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009). While a plaintiff consumer cannot claim an injury just because the consumer bought a product "that they would not have, absent a manufacturer's deceptive commercial practices," a consumer satisfies the injury requirement where the consumer alleges that the deceptive practice caused the consumer to pay "more than the good or service . . . was worth." *Servedio v. State Farm Ins. Co.*, 889 F. Supp. 2d 450, 452–53 (E.D.N.Y. 2012), *aff'd*, 531 F. App'x 110 (2d Cir. 2013) (citations omitted).

Plaintiff alleges that Plymouth Rock engaged in seven "deceptive acts and practices" via the Agreement. *See* Compl. ¶ 79 (a)–(g). The Court finds that the Agreement does not plausibly support six of Plaintiff's allegations that concern the existence, methodology, or competitiveness of the variable rate but does plausibly support one such allegation that concerns renewal notifications.

## 1. Existence, methodology, or competitiveness of the variable rate

One alleged deceptive act is plainly foreclosed by the text of the agreement:

- 14 -

a) Failing to adequately disclose that despite the language of its contracts, Defendant's energy rates will not renew at the same rates upon the conclusion of the initial term, and instead will be at a variable rate;

Compl. ¶ 79(a). As discussed above, the Agreement contains at least four references to the existence of a variable rate. *See* Part II.A, *supra*. And Plaintiff's opposition uses one of these references to acknowledge the existence of a rate before distinguishing discussion of the methodology for that rate. *See* Pl.'s Opp'n 14 ("The Disclosure Statement states '[u]pon conclusion of the Initial Term, this Agreement will automatically renew on a month to month basis at a variable rate[.]' However, the Disclosure Statement does not articulate what the variable rate will be . . . "). A reasonable consumer, therefore, would not have been likely to be misled as to the fact that Defendant might charge a variable rate at the end of the contract's initial term.

Five alleged deceptive acts concern Plymouth Rock's pricing of the variable rate relative to a local utility, its methodology, or its production costs:

b) Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates a customer's existing utility charges;

c) Failing to adequately disclose that customers paying Defendant's variable energy rates receive no material added benefit at a dramatically higher price than if the customer were to stay with the local utility;

e) Failing to adequately disclose the variable rate methodology Defendant used to calculate its variable rates to enable customer to potentially compare prices;

f) Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the customer's local utility would have charged;

g) Failing to adequately disclose that it makes substantially higher profits on its variable rate customers than its fixed rate customers even though there is no material difference between the costs Defendant incurs for its fixed rate customers and those its incurs for its variable rate customers.

Compl. ¶¶ 79(b), (c), (e), (f), (g).

Courts have found allegations of deceptive practices to be implausible where defendants have "actually disclosed the very practices that were alleged to be deceptive." *See Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 125 (2d Cir. 2017) (distinguishing cases with dismissed § 349 claims from a plaintiff's plausible allegations under § 349 that an insurer's rates "did not represent the prevailing competitive labor rates, as [the insurer's policy] purported to do"). In *Richards*, the Second Circuit upheld summary judgment in favor of a defendant ESCO under a similar rationale. *See Richards*, 915 F.3d at 100. The contract's "Evergreen clause" read, "After the Initial Term and during the Renewal Period, the rate for electricity will be variable each month at Direct Energy's discretion. The rate may be higher or lower each month based upon business and market conditions." *Id.* at 94. The plaintiff argued that a reasonable consumer "would likely interpret" that clause to "mean that the variable rate would reflect 'the costs of procuring power . . . plus an appropriate margin to cover the legitimate costs and risks of supplying variable rate customers.'" *Id.* at 100. Yet, under a Connecticut statute that (like § 349) barred deceptive practices, the Second Circuit found that no reasonable consumer could conclude that the defendant's rate-setting was deceptive, since the contract's Evergreen clause "unambiguously allowed [the ESCO] to set the variable rate the way it did." *See id.* As such, the *Richards* court determined "as a matter of law" that the representation would not have "misled a reasonable consumer." *See id.* at 101 (citing *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013)).

In some cases against defendant ESCOs, however, § 349 claims have survived dismissal where a plaintiff alleged that a defendant failed to hew to an allegedly promised market rate. *See, e.g.*, *Yang Chen v. Hiko Energy, LLC*, No. 14 CV 1771 VB, 2014 WL 7389011, at *1 (S.D.N.Y. Dec. 29, 2014) (declining to dismiss a § 349 claim where a contract provided a variable rate

would "reflect the wholesale cost of electricity (including capacity, energy, balancing, settlement, ancillaries), transmission and distribution charges, and other market-related factors . . . "); *Claridge*, 2015 WL 5155934, at *4–5 (declining to dismiss a § 349 claim where a contract promised variable rates would be "calculated" to "include any market prices for commodity, transportation, balancing fees, storage charges, NORTH AMERICAN POWER fees, profit, line losses plus applicable taxes, and any other charges or fees imposed by the utility or other entity having such authority to impose such charges); *Gonzales v. Agway Energy Servs.*, LLC, No. 5:18-CV-235(MAD/ATB), 2018 WL 5118509, at *4 (N.D.N.Y. Oct. 22, 2018) (finding, even where a defendant argued "it has not been misleading because it never represented that savings were guaranteed," a plaintiff plausibly alleged that rates were "'not in fact competitive market rates based on the wholesale cost of electricity' or the factors set forth in the agreement"); *Stanley*, 466 F. Supp. 3d at 433–34 (declining to dismiss a § 349 claim where a plaintiff alleged that defendant's promise of "*most* competitive" rates allegedly promised a customer would save money compared to other ESCOs, and that defendant represented it would provide a "Market" "Pricing Type" with a "monthly variable rate methodology").

Plaintiff pointed out at oral argument that *Richards* was decided in the context of summary judgment. But that case's reasoning still applies to Plaintiff's ultimate burden of proof on his deceptive acts and practices claim. And Plaintiff has far less to support his claim that the contract was affirmatively misleading than did the plaintiffs in *Richards*, *Chen*, *Claridge*, *Gonzales*, or *Stanley*: unlike in those cases, the Agreement here never promised or alluded to a variable rate that would be based in any way on market conditions. *See* Agreement at 2. And Plaintiff's counsel was unable to cite any authority in New York State or in this Circuit to suggest that a court may find an implicit requirement that a variable rate be tied to market conditions where, as here, a contract is *silent* as to the ESCO's methodology of calculating a variable rate or the factors that may impact that rate. Tr. 19:23–20:11.

While anticipating that the variable rate would be based on a market rate may have been a "logical conclusion," *see* Pl.'s Opp'n 14, Plaintiff fails to plausibly allege why the mere fact that ESCOs serve as brokers in the energy

market, *see* Compl. ¶ 18, means that a reasonable consumer would have expected a market rate under the language in the Agreement.  Agreement at 2.  To the extent Plaintiff casts Plymouth Rock's departure from the variable rate charged by a local utility, or the Agreement's absence of rate methodology disclosures as materially misleading omissions, the scenario would be "quite different" if the "business alone"—here, Plymouth Rock— "possess[ed] material information that [was] relevant to the consumer and fail[ed] to provide this information."  *See Oswego Laborers' Loc. 214 Pension Fund*, 647 N.E.2d at 745.  But Plaintiff has not alleged that Plymouth Rock possessed such information and failed to provide it to its customers.  Nor has Plaintiff plausibly alleged that Plymouth Rock had an affirmative duty to include such information in the Agreement; indeed, a business need not "guarantee that each consumer has all relevant information specific to its situation."  *Id.*  Accordingly, Plaintiff has not plausibly alleged that a reasonable consumer could be misled by the Agreement into believing that it would be charged a variable rate set in accordance with market pricing.

## 2. Advance notice of a variable rate

One alleged act that Plaintiff has plausibly alleged, however, concerns the renewal notifications promised by the Agreement:

> d) Failing to provide customers adequate advance notice of the variable rates it would charge;

Compl. ¶ 79(d).  In response, Plymouth Rock argues that the Customer Disclosure Statement and General Terms and Conditions, Term 2, warn that agreements will renew "automatically," and a reasonable consumer would thus likely understand that agreements would indeed automatically renew. Def.'s Mot. 17.

Not necessarily.  The Customer Disclosure Statement states that this Agreement "will automatically renew on a month to month basis at a variable monthly rate unless Plymouth obtains customer's authorization after customer has received written notification of any proposed changes to such terms at least 45 days but no more than 90 days prior to the renewal date (the "Renewal Term")."  Agreement at 2.

Based on this language, there is at least some (and perhaps considerable) ambiguity as to what a reasonable consumer would understand might happen "automatically" at the end of the initial term and what the consumer might need to do, either on its own initiative or in response to "written notifications of any proposed changes" by Plymouth Rock, to *not* automatically renew the contract at a variable rate. And there is ambiguity as to when the consumer might be required to (or have the opportunity to) take such action: Should the consumer wait for Plymouth Rock to send "written notification of any proposed terms" before determining whether to cancel the automatically-renewing contract? What if no such notification is received, or is received outside the 45-to-90-day window specified in this term? Given the complicated and ambiguous language here, Plaintiff has plausibly alleged—at this stage of the litigation—that a reasonable consumer could be misled into believing that, prior to the end of the initial term, she would receive some sort of "written notification" regarding the nature of Plymouth Rock's variable-rate increase and could then determine whether she wished to cancel the automatic renewal.

Further, as Judge Pooler observed in *Richards*, the fluctuating nature of consumers' electricity usage makes the issue of whether an ESCO provided adequate notice of a variable-rate price increase a question that may be better left for a jury:

> [T]he mere fact that a customer can opt out of an auto-renewing contract at any time without breaching it does not mean that the customers will do so when it is in their interest. People are inertial. *The same people who spend hours comparing electricity prices (or credit card rates or online streaming services or magazine subscriptions or gym memberships) are quite unlikely to maintain that level of vigilance once they have habitually received and paid for electricity (or other goods or services) for months or years on end.* . . . Only those who are most anxious about money or most scrupulous about their affairs are likely to pay close attention to the rate they are charged for energy (rather than the gross amount, which varies seasonally and may be due to one's own changes in energy use) and to engage in monthly price comparisons of this rate.

*Richards*, 915 F.3d at 109–10 (Pooler, J., concurring in part and dissenting in part) (citations omitted) (emphasis added).

At this stage, Plaintiff has plausibly alleged that it received no notice before the variable rate billing started and that the contract failed to "*clearly and conspicuously* disclose" (emphasis added) the circumstances under which Plymouth Rock would exercise its option to renew the contract at a variable rate.  Compl. ¶¶ 47–48.  And Plaintiff sufficiently pleads causation, alleging "injury and monetary damages" as a "direct and proximate result" of Plymouth Rock's "unlawful and deceptive marketing and billing practices." Compl. ¶ 81.  At the motion to dismiss stage, it would be "inappropriate" to conclude that Plaintiff cannot show that a reasonable consumer might be misled by the relevant language in the Agreement on this point, nor that Plaintiff fails to allege causation under § 394.  *See Stanley*, 466 F. Supp. 3d at 435–36 (collecting cases to show that "under NYGBL § 349, it is sufficient to allege that 'because of [the] defendant's deceptive act, … [the plaintiff] suffer[ed] a … loss.'").

In sum, Plymouth Rock's motion to dismiss Plaintiff's § 349 claim above is granted as to acts (a), (b), (c), (e), (f), and (g) in paragraph 79 of the Complaint, but is denied as to the claim regarding lack of advance notice alleged under (d).

### D.    N.Y. Gen. Bus. Law § 349-d(7)

The ESCO Bill of Rights requires that, "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."  N.Y. Gen. Bus. Law § 349-d(7).  At issue here is whether the Agreement (1) identified the fact that Plymouth Rock would charge a variable rate after twenty-four months, and (2) did so in a clear and conspicuous manner.

### 1.    Identification

First, as to whether an ESCO has "identified" a charge under § 349-d(7), the Second Circuit has not weighed in as to what the plain text requires,

- 20 -

but district courts have generally concluded that the statute only requires that a company disclose "the existence of a variable rate." *Stanley*, 466 F. Supp. 3d at 436 (quoting *Wise v. Energy Plus Holdings, LLC*, No. 11-CV-7345 (S.D.N.Y. 2011) (pointing out that "Section 349-d elsewhere makes a distinction between the obligation to identify and the obligation to explain" and that little in the legislative or regulatory history "suggest[s] that [§] 349-d(7) is meant to address the content of an energy supply company's identification of its variable charges rather than *the plain fact that they are variable*.") (emphasis supplied)).

Plymouth Rock argues that the "fact" of a variable rate is "sufficiently identified," and that § 349-d(7) does not require an explanation of the "basis on which it varies." *See* Def.'s Reply 10 (quoting *Mirkin*, 2016 WL 3661106, at *5). Plaintiff argues that, unlike the dismissed § 349-d(7) claims in *Mirkin* or in *Forte v. Direct Energy Services, LLC* that concerned "far more robust" descriptions of variable rates, here Plymouth Rock has "failed to include *any* such description regarding the 'variable' rate." Pl.'s Opp'n 17 (distinguishing 2016 WL 3661106, at *3 ("[f]or variable rate, each month will reflect the cost of electricity . . . and other market-related factors"); 17-CV-264, 2017 WL 3495861, at *2 (N.D.N.Y. Aug. 14, 2017) ("*Forte I*") ("[y]our price may fluctuate from month-to-month based on wholesale market conditions . . . ")). Yet, as noted above, the Agreement clearly discloses that Plymouth Rock would begin to charge a variable rate for its services at the end of the Initial Term in four separate places. And Plaintiff has not cited any authority (whether controlling or persuasive) to support its proffered interpretation of § 349-d(7), *i.e.,* that § 349-d(7) requires not just disclosure of a variable-rate charge, but a more robust explanation of the variable-rate pricing and how it will be calculated.

## 2.    Clear and conspicuous disclosure

Second, at the motion to dismiss stage, a court must determine whether "it is plausible that a reasonable jury could find that Defendant's disclosure [itself] . . . fails to be conspicuous." *Stanley*, 466 F. Supp. 3d at 437 (quoting *Forte I*, 2017 WL 3495861, at *7). Courts evaluating such claims in the ESCO context have considered a range of contract terms (and their placement within contracts). For example, in *Mirkin*, an ESCO contract

clearly and conspicuously disclosed a variable rate "in several different places
. . . using the same font that is used for the rest of the text, that the contract
changes to a variable rate plan after the first six months. Two of those places
[we]re called out in a box clearly intended to highlight the most relevant
terms to consumers." 2016 WL 3661106, at *5. But in *Forte I*, a plaintiff
plausibly alleged a contract did not clearly and conspicuously disclose a
variable rate where its Customer Disclosure Statement "merely mention[ed]
a variable rate plan and d[id] not mention that Defendant [would] charge a
variable rate per kWH, nor [wa]s it conspicuously displayed," its terms and
conditions did not highlight the impending variable rate, and its welcome
letter did not mention a variable rate. 2017 WL 3495861, at *7 ("Surely, the
requirement that the disclosure be 'conspicuous' requires something more
than maintaining the same sized font, the same color, and placement in the
sixth subsection of the Terms and Conditions.").

In *Stanley*, a middle ground between the two, a plaintiff's § 349-d(7)
claim survived dismissal after the plaintiff "allege[d] at least once that
neither the 2012 nor 2013 Renewal Notification disclose[d] that 'Defendant
will charge a variable rate per kWh.'" 466 F. Supp. 3d at 437. And, after
analyzing language that included two disclosures in "small print" on the back
of the notifications, the court concluded it was "not confident enough in the
clarity of the language of the Renewal Notifications to rule as a matter of law
that the existence of a variable rate plan was 'clearly and conspicuously'
disclosed to Plaintiff." *Id.* at 436–37.

"Although neither [the Second Circuit] nor the New York Court of
Appeals has articulated the standard for determining compliance with
Section 349-d(7)'s requirement that variable rate disclosures be clear and
conspicuous," the Second Circuit upheld a grant of summary judgment on a
§ 349-d(7) claim in one case using an objective, reasonable consumer
standard for alleged deceptive acts under § 349.[6] *Forte v. Direct Energy
Servs., LLC*, No. 22-201, 2023 WL 382681, at *1–2 (2d Cir. Jan. 25, 2023)
("*Forte II*"). To analyze variable rate disclosures under that standard, the

---

[6] In *Forte II*, the "parties agree[d] that an objective reasonable
consumer test [was] the proper standard." 2023 WL 382681, at *1.

court applied the Federal Trade Commission's multi-factor test for online disclosures, which considers disclosures' placement and prominence, effectiveness in light of other elements that might distract consumers' attention from the disclosures, and clarity of language. *Id.* at *2. Considering these factors, the court reasoned that language promising that an ESCO contract would "automatically renew for successive month-to-month periods at our standard variable rate plan as per the price applicable to the Terms and Conditions" was not "complex nor encumbered by voluminous surrounding text," was written in "language that a reasonable consumer would understand," displayed in a table with "generous spacing and boundaries around each box," and underpinned by plain language of the fixed rate, renewal notification, and automatic renewal. *Id.* at *3. Taken together, the variable rate disclosure was "clear and conspicuous as a matter of law." *Id.*

Here, Plaintiff has not plausibly alleged that the disclosures' placement and prominence, effectiveness in light of other elements that might distract consumers' attention from the disclosures, or clarity of language fail to identify the existence of a variable rate clearly and conspicuously. Like the Customer Disclosure Statement in *Forte II*, the Customer Disclosure Statement here distinguishes its content from the surrounding text, ostensibly including the references to a "Fixed, Hourly LBMP or Variable rate per kWh" under the Price row; a reference to "variable service" under "Amount of Early Termination Fee and method of calculation," and renewal "on a month to month basis at a variable monthly rate" under "Provisions for renewal of the agreement." Agreement at 2. The same language for renewal appears under Term 2. *Id.* Looking at the relevant portions of the Agreement (as shown below), with the variable-rate provisions highlighted for reference, any reasonable consumer would find the existence of Plymouth Rock's option to charge a variable rate after twenty-four months clearly and conspicuously identified. Indeed, it is clear to this Court that no reasonable consumer could read these terms—whether alone, or in context of the entire Agreement—and conclude that it would necessarily continue to reap the benefits of fixed-rate pricing after the Initial Term expired.

**Figure 1.  Agreement (ECF No. 1-1)**



**New York Electricity Commercial Service Agreement**



## Customer Information

| | | | |
|---|---|---|---|
| **Name** | Yetev lev | **Date** | 11/9/2017 |
| **Address** | 150 Rodney st<br>Brooklyn NY 11211 | **Contract Term** | 24 months beginning with the first Meter Read on or after 12/1/2017 |
| **Email** | | **Type** | Renewal |
| **Phone** | | **Contract Volume** | 5,640,418 |
| **SS#/EIN#** | | | |

### Account Information

**See Schedule A for a list of the Utility Accounts covered under this agreement**

### Customer Disclosure Statement

| | |
|---|---|
| Price | Fixed, Hourly LBMP or variable rate per kWh plus applicable taxes, and plus any costs and expenses resulting from a Change in Law in accordance with paragraph 18 of this Agreement. |
| How the price is determined | Fixed rate of $0.06970 per kWh, plus utility service and delivery charges, (GRT and sales tax where applicable) plus applicable taxes, in addition to any costs and expenses resulting from a Change in Law in accordance with paragraph 18 of this Agreement. Price does include Customer's applicable share of the Company's cost to comply with the renewable energy and zero emission credit components of the New York Clean Energy Standard. |
| Length of the agreement and end date | 24 months beginning with the first Meter Read on or after 12/1/2017 |
| Amount of Early Termination fee and method of calculation | No early termination fee for variable service. If fixed or LBMP service Customer will be charged the projected amount of electricity to be consumed by Customer for the remainder of the current Term multiplied by the difference between the contract price in effect for the remainder of the current Term and the price at which Plymouth can sell such electricity following the termination. |
| Amount of Late Payment Fee | Customer will be charged 1.5% on overdue balances if Invoice is not paid in full within 15 days of the invoice date. |
| Provisions for renewal of the agreement | Upon completion of the initial Term, this Agreement will automatically renew on a month to month basis at a variable monthly rate unless Plymouth obtains customer's authorization after customer has received written notification of any proposed changes to such terms at least 45 days but no more than 90 days prior to the renewal date (the "Renewal Term"). Customer shall retain the right to renew, terminate or renegotiate this Agreement prior to the anniversary date of the renewal period. |
| Guaranteed Savings | This agreement offers no guaranteed savings. |
| Consolidated Billing | Plymouth supply charges will be presented on the utility invoice |

### Invoice Information

Invoices for the Utility Accounts on this Agreement will be sent to:   150 Rodney st
Brooklyn NY 11211

### General Terms and Conditions

**1. Agreement to Sell and Purchase Energy.** This is an agreement between Plymouth Rock Energy, LLC ("Plymouth") and the undersigned customer ("Customer") under which Customer shall initiate electricity service and begin enrollment with Plymouth (the "Agreement"). Subject to the terms and conditions of this Agreement, Plymouth agrees to sell and deliver, and Customer agrees to purchase and accept the quantity of electricity, as estimated by Plymouth, necessary to meet Customer's requirements based upon consumption data obtained by Plymouth or the delivery schedule of the Local Distribution Utility (the "LDU"). The amount of electricity delivered under this Agreement is subject to change based upon data reflecting Customer's consumption obtained by Plymouth or the LDU's delivery schedule. The LDU will continue to deliver the electric commodity supplied by Plymouth.

**2. Term.** This Agreement shall commence as of the date Customer's notice regarding the change of Customer's provider to Plymouth is deemed effective by the LDU, and shall continue for 24 months beginning with the first Meter Read on or after 12/1/2017 , (the "Initial Term"). Upon completion of the Initial Term, this Agreement will automatically renew on a month-to-month basis at a variable monthly rate, unless Plymouth sends Customer written notice of proposed changes to such terms in advance of the renewal date (the "Renewal Term"). Any such written notice will be sent at least 45 days and no more than 90 days prior to the renewal date, apprising Customer of any proposed changes in the terms and conditions of this Agreement and of the Customer's right to renew, terminate or renegotiate this Agreement. While receiving service on a month-to-month basis, either Customer or Plymouth may cancel or terminate this Agreement

Contract Id (v1.51): 265277 - 454347

Page 1 of 3

In addition, because a § 349-d(7) claim cannot be premised on whether a contract explains the methodology for a variable rate, the extent to which a consumer could "understand what the variable rate is absent any description of the market factors or other elements regarding the rate," *see* Pl.'s Opp'n 19, cannot form a successful allegation for a failure to "clear and conspicuously" identify a variable rate under § 349-d(7).

Therefore, Plymouth Rock's motion to dismiss Plaintiff's § 349-d(7) claim is granted.

### E.   **Unjust enrichment**

Plymouth Rock argued that Plaintiff's unjust enrichment claim failed because (1) the existence of a valid contract precludes an unjust enrichment claim, and Plaintiff has not disputed the validity of the contract, and (2) the statutory section 349-d of the New York General Business Law claims that give a remedy at law preclude an unjust enrichment claim in equity. *See* Def.'s Mot. 20–21 (citations omitted).  In its opposition brief and again at oral argument, Plaintiff withdrew its unjust enrichment claim.  Pl.'s Opp'n 21–22; Tr. 43:1–6.  That claim is hereby dismissed.

## IV.   CONCLUSION

In sum, Plymouth Rock's motion to dismiss Plaintiff's breach of contract claim is granted; its motion to dismiss Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is denied; and its motion to dismiss Plaintiff's claims under sections 349 and 349-d(7) of the New York General Business Law is granted in part and denied in part.  Further, Plymouth Rock's motion to dismiss Plaintiff's claim for unjust enrichment is granted as unopposed.

SO ORDERED.

_/s/ NRM_
NINA R. MORRISON
United States District Judge


Dated:    July 21, 2023
          Brooklyn, New York